UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TIMOTHY FINLEY #266147,

        Plaintiff,                          Case No. 2:17-cv-149

                                            Hon. Paul L. Maloney
                                            U.S. District Judge

    v.

MANDI SALMI, et al.,

        Defendants.

_____/

TIMOTHY FINLEY #266147,

        Plaintiff,                          Case No. 2:17-cv-159

                                            Hon. Paul L. Maloney
                                            U.S. District Judge

    v.

STEVE MLEKO, et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

### Introduction

This report and recommendation addresses two civil rights actions brought by state prisoner Timothy Finley pursuant to 42 U.S.C. § 1983.   In these actions, Finley alleges that Defendants violated his Eighth Amendment rights by failing to correct excessive noise levels at Marquette Branch Prison (MBP), by failing to provide proper

medical treatment in response to his self-harm actions, and by failing to take appropriate actions to prevent him from engaging in self-harm.[1]

Defendants have filed motions for summary judgment in both cases. (ECF Nos. 59 and 88 in case no. 2:17-cv-149, and ECF Nos. 58 and 92 in case no. 2:17-cv-159.) Finley filed motions to strike affidavits. (ECF No. 101 in case no. 2:17-cv-149 and ECF No. 105 in case no. 2:17-cv-159.)

The undersigned respectfully recommends that the Court (1) deny Finley's motions to strike affidavits, and (2) grant Defendants' motions for summary judgment.

## Defendants

Finley named twenty-two Defendants in his consolidated cases. Finley has agreed to voluntarily dismiss seven Defendants: Andrew Boudreau, Dennis Viitala, Erica Huss, Sarah Schroeder, Unknown Chief Medical Officer, Carrie Guizztti, and Paul Eyke. (Case No. 2:17-cv-149, ECF No. 80, PageID.1098.)

The remaining fifteen Defendants and the claims against them are:

1)  Defendant Warden Robert Napel, for subjecting Finley to excessive noise levels at MBP;

---

[1]    This Court issued an order consolidating Case Nos. 2:17-cv-149 and 2:17-cv-159 in October 2018. (*See* Case No. 2:17-cv-149, ECF No. 63, PageID.1013.) The Court denied Defendants' motion to consolidate these cases with Case No. 2:18-cv-100, which is another case filed by Finley. That case alleges that Erica Huss and Sarah Schroeder failed to provide appropriate mental health treatment during the same time period. Case No. 2:18-cv-100 is currently pending before the Court.

2)    Defendant nurses and health services personnel Derek Falk, Joanne Samuelson, Steve Mleko, Martin Hedlund, Adam Foster, Bonnie Steade, John Kimsel, and Mandi Salmi, for failing to provide medical care;

3)    Defendants Mleko, Foster, and Hedlund for conspiracy; and

4)    Defendant Corrections Officers Craig Tasson, Christopher Feltener, Michael Schetter, Steven Sharret, Aaron Kratt, and Carl Baldini, for failing to protect and for delaying or denying medical treatment.

## Factual Allegations

Finley alleges that he has been diagnosed with bipolar disorder, exhibitionism, antisocial personality disorder, and borderline personality disorder. Finley states that mentally ill prisoners are scattered throughout MBP prison population and that he was subjected unnecessarily to excessive noise and placement near disruptive prisoners who scream all day, bang on metal footlockers, laugh loudly, clap, whistle, or sing.   He asserts that inmates set fires and break water sprinklers, which continually triggers loud alarms.   Finley asserts that the noise level has caused a severe deterioration of his mental health and psychological stability. Finley says that these conditions caused him to cut himself and swallow razor blades between August 30, 2016, and September 29, 2016. Finley says that although he complained about the excessive noise levels to Warden Napel, the Warden failed to address and correct the excessive noise levels.[2]

---

[2]    Allegations against Defendant Napel are asserted in the amended complaint in case no. 2:17-cv-149. (ECF No. 18.)

3

Finley explains that he has a long history of self-injurious behavior dating back to 1993.   Finley alleges that on August 30, 2016, he was escorted to a suicide observation cell.   He was strip searched and a Prisoner-on-Assignment (POA) was assigned to observe Finley and to inform an officer if Finley engaged in self harm behavior.   Twenty minutes later, Finley cut his arm with a razor blade that he smuggled into his cell.   The POA informed Defendant Tasson, who contacted health care.   Registered Nurse (RN) Calvin Burdick treated Finley for his injuries.   Finley asserts that Defendant Tasson failed to follow policy, which would require Tasson to inform the Control Center and place Finley in restraints.   As a result, Finley was able to keep the razor blade.

Finley claims that Defendant Salmi changed his management plan and, as a result, as of August 31, 2016, he was no longer under constant observation.   Finley, using the same razor blade, cut his arm and smeared blood on his cell wall. Defendant Feltner saw Finley with blood on his arm.   Finley told him he needed to see health care, and Defendant Feltner walked away. Defendant Sharett stopped in front of Finley's cell and looked at his arm.   Finley says that he told Sharett that he used a razor blade.   According to Finley, Defendant Sharett closed the door and walked away.

Finley asserts that Nurse Practitioner Boudreau, who works for the mental health department, visited Finley in his cell.   Boudreau notified RN Sarah Flinchum after he observed blood on the cell wall.   Nurse Flinchum treated Finley's injuries.

4

That same day (August 31, 2016), while Defendant Tasson was working, Finley used the same razor blade to cut himself again.   According to Finley, Defendant Tasson informed health care services after Finley showed him his arm.   Defendant Steade treated Finley's wounds.

On September 26, 2016, Finley again cut himself with a razor blade he was able to obtain and hide.   Finley showed Defendants Schetter and Feltner his wounds.   Finley asserts that they did nothing.   Defendant Steade told Finley that she would contact Defendant Falk.   Defendant Falk provided treatment for Finley's injuries.   Falk told Finley that he would speak with Nurse Practitioner (NP) Boudreau to obtain help.   Later that day, Finley began cutting himself while the officers in the control center watched the camera.   RN Calvin Burdick was notified and acted immediately.   Defendant Falk also came to Finley's cell.   Later that night, Finley cut himself again and then swallowed the razor.

RN Burdick responded and informed Finley that he needed to go to the hospital.   Finley was transferred to Marquette General Hospital.   The Specialist informed Finley that he needed surgery to remove the razor blade.   Finley refused surgery because of "the specialist's indecisiveness as to how he was going to retrieve the razor."   (ECF No. 1, PageID.8.)

Finley asserts that, between August 3, 2016, and September 1, 2016, he made at least 20 lacerations to his arm from the same razor blade and ultimately swallowed that razor blade to stop himself from cutting.

5

Between September 2, 2016, and September 5, 2016, Finley alleges that he was denied medical care and treatment.    Finley alleges that, on September 2, after he complained about pain in his throat and seeing blood, Defendant Mleko visited his cell.    Finley says he informed Defendant Mleko that he was in extreme pain, but Defendant Mleko responded that Finley should not have refused medical treatment and that he was already medically cleared.    Finley says Defendant Mleko walked away.    Finley says he started to bite the lacerations on his arm and spit blood on the wall hoping that someone would take notice, but no one responded.    Finley says he began yelling at anyone who passed by his cell for assistance.    This caused the razor blade in his throat to shift and he began to bleed inside his throat. Finley coughed up a large amount of blood.

Finley states that RN Sarah Flinchum informed him that she would notify Defendant Mleko.    Licensed Practical Nurse (LPN) Laurie Levi also stated that she would notify Defendant Mleko.    Psychiatrist Dr. Terry Meden visited Finley and asked if he was ready to comply with treatment.    Finley responded affirmatively and Dr. Meden stated he would contact health care.

According to Finley, Defendant Kimsel told him that if he stopped swallowing razor blades, he would not have these problems.    Finley was told by Corrections Officer Fish that a nurse would be contacted.

Later that evening, RN Foster visited Finley.    According to Finley, after RN Foster spoke with Defendant Mleko, Foster informed Finley to let the razor blade pass.    Defendant Steade contacted Defendant Samuelson and then told Finley to let

6

the razor blade pass.    Finley states that Defendant Steade was lying and had never contacted Defendant Samuelson.    Defendant Steade informed Finley that she hadn't lied.    Finley asserts that he was not provided medical care until September 5.    On that day, according to Finley, Defendant Mleko "grudgingly" called a medical provider and Finley was taken back to Marquette General Hospital.    The specialist was unable to retrieve the razor blade from Finley's throat.

Finley returned to the prison and was placed on a soft diet.    Defendant Falk replaced Finley's Vicodin pain medication with Tylenol.    On September 7, Defendant Salmi released Finley from suicide observation.    On September 8, Finley was placed in a segregation unit, but was able to obtain another razor blade.    Finley cut his arm with the razor blade.    Defendant Kratt looked at the cuts on Finley's arm and walked by the cell.    Finley was then placed in an observation cell.    Finley questioned Defendant Kratt regarding why he did nothing, and Kratt responded: "I was hoping you would have broken your sprinkler so I could have gotten out of having to run showers tonight." (Case No. 2:17-cv-159, ECF No. 1, PageID.14.)

On September 17, Finley was released to general population.    Finley says that everyone should have known to not give him a razor blade, but that Defendant Baldini nevertheless gave Finley a razor blade.    Finley says he refused to return the razor blade to Defendant Baldini and said he had flushed it down the toilet.    Finley was strip searched, returned to segregation and placed on suicide watch.    Defendant Baldini was ordered to personally observe Finley to make sure he did not hurt himself.    Finley says that, about twenty minutes later, he pulled out the razor blade

and started cutting himself.   According to Finley, Defendant Baldini stated, "[t]hat's disgusting.   Turn your light off for I do not want to see it."  (*Id*.)   Finley was taken to health care and transported to Marquette General Hospital.

Finley says he still had a razor blade in his throat.   X-rays were taken and it was confirmed that a razor blade was still lodged in his throat and another one was in his stomach.   Medical staff were unable to retrieve either razor blade.   Finley was released from the hospital and given a soft diet and Tylenol-3.   However, the next day, he was not provided with Tylenol-3.

Finley says that Defendant Salmi removed him from suicide watch.   Finley was placed in segregation, but was able to obtain a razor blade sometime around September 26. Finley says he cut his arm, overdosed on medication, and swallowed a portion of the razor blade.   Finley returned to Marquette General Hospital and x-rays revealed that there was a razor blade still in his throat and two razor blades in his stomach.   Finley had surgery.   When he awoke, he was informed that the razor blade in his throat could not be located but both razor blades were removed from his stomach.

Finley returned to prison.   On September 28, Finley took a piece of a razor blade and began cutting himself.   Then, he swallowed the razor piece.   Finley was taken to health care and it was determined that he appeared fine and that they would monitor him.   The next day, Finley cut himself with another portion of a razor blade, swallowed some pills, and swallowed the portion of the razor blade.   Finley was

transported to Marquette General Hospital and then sent to the University of Michigan Hospital for further treatment.

Finley requests compensatory, nominal, and punitive damages against each Defendant.  In addition, he requests that the Court order that he receive independent mental health care treatment outside of the MDOC.

## Motion to Strike

Finley asks this Court to strike statements in Defendants' affidavits because he has presented contrary evidence to support his allegations.  Finley is free to disagree with Defendants' affidavits and present contradictory evidence that could create an issue of material fact.  However, Finley fails to assert a valid reason to strike any relevant portion of any Defendant's affidavit.  Accordingly, the undersigned respectfully recommends that this Court deny Finley's motions to strike portions of the affidavits. (Case No. 2:17-cv-149, ECF No. 101 and Case No. 2:17-cv-159, ECF No. 105.)

## Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*,

421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## Eighth Amendment

Finley's claims involving exposure to excessive noise, failure to protect from self-injurious behavior, and failure to provide adequate medical treatment arise under the Eighth Amendment.  The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency."  *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain."  *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347.

The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant

experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

### 1.  Noise Levels

Finley argues that he was subjected to excessive and unnecessary noise while he was housed at MBP.   Finley alleges that the noise levels exacerbated his mental health issues and caused him to engage in self-injurious behavior.   Finley states that Defendant Warden Napel took no action to correct the excessive noise levels at MBP, in violation of his Eighth Amendment rights.

While a prisoner is not entitled to live in a noise free environment, exposure to unnecessary, excessive noise could support an Eighth Amendment violation. *Northington v. Armstrong*, 1:10-cv-424 (W.D. Mich. April 5, 2011) (ECF No. 201).   A prisoner must show that "the noise is so excessive and pervasive as to pose a serious risk of injury."   *Rouse v. Caruso*, 06-cv-10961-DT, 2011 WL 918327, at *20 (E.D. Mich. Feb. 18, 2011) (citing *Lunsford v. Bennett*, 17 F3d 1574, 1580 (7th Cir. 1994)). In addition, a prisoner must establish that the official was subjectively aware of the

risk of injury and disregarded that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 829, 847.

In the opinion of the undersigned, Finley cannot establish that the noise levels posed a pervasive risk of injury. Defendant Napel attests that all MBP staff members are responsible for keeping noise levels at acceptable levels in the housing units. (Case No. 2:17-cv-149, ECF No. 90-2, PageID.1269.) Each unit has sound absorbing panels on interior and exterior walls to reduce noise. (*Id*. at PageID.1270.) To his knowledge, noise levels were at acceptable levels in the housing units during his tenure as warden of MBP. (*Id*.) Napel included the 2017 Annual Sanitation Inspection Report for MBP as an attachment to his affidavit. The report indicated that noise levels were acceptable in each housing unit.[3] (*Id*.)

---

3      The portion of the report analyzing sound levels in MBP included the following information:

3.      **Sound levels** were checked in each of the housing units and were judged to be acceptable (47-60 decibels, A-weighted). Sound levels do not exceed 70 decibels during the day (and are reduced to at a maximum of 45 decibels at night).

**SOUND LEVELS - DECIBELS, A-WEIGHTED (dBA)**

| UNIT | dBA |
|---|---|
| A Dorm | 51-60 |
| N Dorm | 55-56 |
| O Dorm | 56-60 |
| P Dorm | 54-59 |
| B Block | 54-60 |
| D Block | 56-60 |
| E Block | 48-56 |
| F Block | 47-46 |
| G Block | 55-60 |
| Q Block | 56-60 |

(Case No. 2:17-cv-149, ECF No. 90-2, PageID.1274.) According to the report, sound levels in the housing units were determined to be acceptable and did not exceed 70

Finley submitted a written complaint to Defendant Napel in 2012, 4 years before the August and September 2016 incidents, about noise levels and he received a response.   (Case No. 2:17-cv-149, ECF No. 100-4, PageID.1396-1399.)   After an investigation, it was determined that the noise level in Finley's housing unit was at an acceptable level.   Defendant Napel conducted regular rounds in the housing units and the units were usually quiet.   (*Id*. at PageID.1270.)

Further, Finley has not presented medical documentation that support his assertion that he needed to live in a quieter housing unit due to any medical or mental health needs. Finley has failed to allege facts that establish a genuine issue of material fact regarding his claim that he suffered unnecessarily due to the noise levels in his prison unit.   Being subjected to a few hours of loud noises that are annoying or inconvenient fails to support an actionable violation of the Eighth Amendment.   *Rouse,* 2001 WL 918327 at *20 (citing *Lunsford*, 17 F.3d at 1580). Finley has failed to establish a disregard for his welfare.   *Id*.   More specifically, Finley has failed to allege facts that establish a genuine issue of material fact regarding his claim that Defendant Napel was deliberately indifferent to any specific health needs caused by noise in Finley's housing unit.

### 2. Medical Care

Finley argues that he received constitutionally inadequate medical care while he was confined at MBP.   The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care

---

decibels during the day or 45 decibels at night.

would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer*, 511 U.S. at 834. To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of

14

causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5

15

(6th Cir. 1976).   If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."   *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).   He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

## The Medical Record

Medical records depict an extensive series of interactions between Finley and medical and psychiatric personnel at MBP and Marquette General Hospital in August and September 2016.   These interactions occurred because Finley obtained razor blades, hid them, cut himself repeatedly, and then swallowed the blades.   The

records, which are summarized below, reflect an extensive and ongoing effort to deal with the medical, mental health and security ramifications of Finley's actions.

First, records indicate that, on August 30, 2016, Finley was placed on constant observation after he cut his right forearm. (Case No. 2:17-cv-149, ECF No. 90-1, PageID.1165-1166.)  The four lacerations were minor and treated by medical staff. (*Id.*)  Finley was placed on moderate precautions for suicide risk. (*Id.* at PageID.1168.)  After his August 31, 2016, mental health evaluation, Mark W. Hares, MS, LLP, issued a MDOC Mental Health Management Plan to the housing unit staff. (*Id.* at PageID.1169-1170.)  Finley was placed at a moderate risk for suicide or self-injury, placed on observation, and was restricted from obtaining eating utensils, razor blades, and plastic bags. (*Id.*)

Medical records indicate that NP Boudreau conducted a medical review on August 31, 2016. (*Id.* at PageID.1171-1173.)  Boudreau noted that Finley had been cutting his arm and writing on walls with his blood. (*Id.*)  Finley was frustrated with his mental health treatment and was acting out by cutting himself. (*Id.*)  Finley was assessed with bipolar disorder, exhibitionism and antisocial personality disorder, and was being treated with medication. (*Id.*)

Medical records indicate that, during a September 1, 2016, suicide evaluation conducted by Defendant RN Salmi, Finley reported that he enjoyed cutting his arm. Defendant Salmi noted superficial scratches and recommended a moderate management plan. (*Id.* at PageID.1174-1175.)  Later that day, Finley reported that he had swallowed a razor blade and it was stuck in his throat. (*Id.* at PageID.1176.)

17

Defendant Nurse Practitioner Samuelson authorized Finley's transport to the Marquette General Hospital emergency department.   (*Id*.)

Records indicate that, while at the hospital, Finley refused surgery to remove the razor blade.   (*Id*. at PageID.1181-1182).   Upon return to MBP on September 2, 2016, Finley was placed on constant observation with a POA and restricted to finger foods.   (*Id*.)   Defendant RN Hedlund noted that Finley received five x-rays, a CT scan, and an Upper GI. Doctors were unable to remove the razor blade and Finley refused further treatment.   (*Id*. at PageID.1182.) Finley slept during Defendant Hedlund's shift.   (*Id*. at PageID.1183.)   Nurse Practitioner Falk visited with Finley and noted he had eaten food since returning from the hospital, was not coughing or spitting up blood and pretended to be asleep inside his cell.   (*Id*. at PageID.1184-1185.)   He indicated that health care should be notified if Finley started bleeding in his mouth or rectum and ordered imaging to follow the progression of the razor blade through the body.   (*Id*. at PageID.1185.)

Later that day – September 2, 2016 – Defendant RN Foster noted that Finley was yelling throughout Foster's shift regarding his lack of medical care. (*Id*. at PageID.1188.)   Finley felt that his vital signs should be constantly monitored because he had spit blood on the wall and floor. (*Id*.)   Defendant Foster found no blood in Finley's oral cavity and noted that Finley was able to eat dinner and yell loudly without difficulty. (*Id*.)   Finley was being monitored by video camera.   He was observed laying on the bed taking naps and periodically waking up and yelling for a nurse.   (*Id*.)   It appeared that he was sucking blood out the lacerations in his

18

arm, spitting the blood into a cone cup, and then pouring it out onto his cell floor. (*Id.* at PageID.1189.) Foster noted that Finley's blood was mixed with water "for effect." (*Id.* at PageID.1188.)   Finley was informed that he was not actively bleeding, and that monitoring would continue.   (*Id.*)

According to the medical records, on September 5, 2016, Finley was examined by Defendant RN Mleko due to spitting up blood.   (*Id.* at PageID.1191-1192.) Defendant Mleko contacted Defendant Samuelson, who authorized Finley's transport to the Marquette General Hospital emergency department for further evaluation and treatment.   (*Id.*)   Defendant Mleko advised Finley that he should not eat or drink anything in case a surgical procedure is necessary. (*Id.*)   To help Finley reduce his stress level, Defendant Mleko provided Finley with anxiety reduction techniques, and recommended that he elevate his legs, rest, and slow down his breathing.   (*Id.*) Finley was taken to the hospital.

According to the medical records, upon his return from the hospital, Defendant RN Hedlund noted that hospital staff believed the razor blade had been coughed up or was lodged in soft tissue and could not be removed.   (*Id.* at PageID.1197.)   During a September 6, 2016, suicide evaluation with Defendant Salmi, Finley reported that he was feeling better and thought the razor blade moved out of his system.   (*Id.* at PageID.1198.)   Finley was still considered as a moderate risk and would be continually monitored.   (*Id.*)   On September 7, 2016, Finley reported to Defendant Salmi that he was ready to return to the housing unit. (*Id.* at PageID.1203.) Defendant Salmi reduced Finley's suicide risk to intermediate with continued

19

monitoring during regular rounds.   (*Id.* at PageID.1204.)   It was noted that if Finley engaged in self-injurious behavior, he would be placed back on constant observation.   (*Id.*)

According to the medical records, the next day, Finley was observed opening-up his arm wounds and writing "DEATH" on the wall with his own blood. (*Id.* at PageID.1207.)   Finley was placed in a segregation cell after receiving a threatening-behavior misconduct ticket.   (*Id.*)   Defendant Salmi placed Finley back on a moderate management plan.   (*Id.*)   Defendant Salmi issued a Mental Health Management Plan to housing unit staff.   (*Id.* at PageID.1208.)   Finley was placed in an observation cell with 15-minute duration, variable round observation. Property was removed and Finley was given a suicide garment and a mattress. (*Id.*) Finley was provided only finger foods and was under constant observation while in the yard and taking showers.   (*Id.*)

On September 9, 2016, Finley reported that he was considering going on a hunger strike due to frustration with his current situation.   (*Id.* at PageID.1209.)

As of September 12, 2016, it was reported that Finley was eating, sleeping, and taking his medication.   (*Id.* at PageID.1211.)

According to the medical records, Defendant Salmi evaluated Finley on September 13, and September 14, 2016.   (*Id.* at PageID.1213-1214.)   Finley expressed frustration and reported that he wanted to hurt himself.   (*Id.*)   On September 15, 2016, Finley indicated that he was eating and taking his medication and was "ready to return to routine handling."   (*Id.* at PageID.1217.)   Defendant

20

Salmi reduced Finley to an intermediate management plan without restriction and issued a new Mental Health Management Plan to housing unit staff with instructions to observe Finley during regular rounds.   (*Id*. at PageID.1218.)

On September 18, 2016, Finley cut his arm with a razor blade and reported that he swallowed the razor blade.   (*Id*. at PageID.1219.)   Finley was transported to the Marquette General Hospital emergency department for treatment and evaluation and then to St. Francis Hospital in Escanaba, but doctors were unable to remove the razor blade.   (*Id*. at PageID.1223, 1231.)

The medical records show that, on September 20, 2016, Defendant Salmi evaluated Finley for suicide risk and determined that he should be placed on a moderate management plan and in a suicide observation cell.   (*Id*. at PageID.1229.) Defendant Salmi issued another Mental Health Management Plan to housing unit staff placing Finley on restrictions with 15-minute duration variable round observation.   (*Id*. at PageID.1230.)

On September 21, 2016, Mark Hares conducted a suicide risk evaluation.   (*Id*. at PageID.1240.)   Finley was eating and sleeping fine and denied wanting to engage in self-injurious behavior.   (*Id*.) Finley indicated that he wanted to return to his regular cell and make a commitment to safety.   (*Id*.)   Hares issued a Mental Health Management Plan to housing unit staff placing Finley on intermediate risk without restrictions with observation during regular rounds.   (*Id*. at PageID.1241.)

Records show that, on September 27, 2016, Finley cut his right arm with a razor blade, swallowed the razor blade, and took over 10 Lipitor pills.   (*Id*. at

PageID.1243.)   Finley was transported to Marquette General Hospital.   (*Id*. at PageID.1245.)   Finley returned from the hospital on September 28, 2016.   (*Id*. at PageID.1248.)   The hospital staff indicated that they removed razor pieces from Finley's stomach but were unable to remove the razor blade lodged in his throat.   (*Id*. at PageID.1249.)   NP Falk noted that Finley was approved for a transfer to a facility for specialized care.   (*Id*. at PageID.1250.)   Defendant Salmi conducted a suicide risk evaluation and recommended a moderate management plan.   (*Id*. at PageID.1252.)   Defendant Salmi issued a Mental Health Management Plan to housing unit staff placing Finley on restrictions with 15-minute duration variable round observation.   (*Id*. at PageID.1253.)

On September 29, 2016, Mark Hares determined that Finley should remain on moderate suicide risk status.   (*Id*. at PageID.1255-1256.)   That day, Finley swallowed a handful of pills and stated that he had cut himself with a razor blade and then swallowed it. (*Id*. at PageID.1257-1258.)   Finley was transported to Marquette General Hospital and then airlifted to the University of Michigan Hospital for further treatment.   (PageID.1258-1266.)   A sigmoidoscopy was performed on October 3, 2016.   (Case No. 2:17-cv-159, ECF No. 59-3, PageID.848.)   The razor blade was not located.   (*Id*).

## Analysis

The record unquestionably establishes that Finley suffers with mental health issues that are objectively serious and require medical intervention.   For purposes of the Eighth Amendment, Finley's mental health issues meet the objective standard.

The key issue in this case is whether each Defendant subjectively acted with deliberate indifference to Finley's mental and medical health needs.

As outlined above, Finley received extensive medical care and mental health treatment while he was confined within MBP.    Although the Eighth Amendment requires prisons to provide medical care and treatment, disagreements with medical professionals regarding the course of treatment fail to support an Eighth Amendment claim.    *Sanderfer*, 62 F.3d at 154-55.    Similarly, conduct that could only establish negligence or malpractice under state law fail to support an Eighth Amendment cause of action.    *Id*.    The Eighth Amendment requires Finley to prove that each Defendant acted with deliberate indifference toward his serious medical needs.    *Id*. In the opinion of the undersigned, Finley cannot establish that any Defendant acted with deliberate indifference.    Furthermore, the record fails to show a genuine issue of material fact relating to this issue.

The medical records establish that MBP nurses and mental health staff dealt with a challenging combination of mental health, physical health and security issues over the time they cared for Finley.    Staff provided Finley with extensive ongoing care while he was confined at MBP.    Finley's claim that the care he received was not only insufficient, but so poor that it constituted a violation of the Eighth Amendment is not supported by the evidence.    The undersigned will provide some additional analysis with regard to particular Defendants below.

Finley alleges that Defendant Salmi failed to properly assess his mental health condition and, as a result, failed to protect him from future harm.[4]  As outlined above, Defendant Salmi assessed Finley's mental health condition by conducting suicide risk evaluations.   In making her recommendations, she consulted with his mental health providers.   (Case No. 2:17-cv-149, ECF No. 90-1, PageID.1161.) During September of 2016, Defendant Salmi evaluated Finley's suicide risk and self-injury risk.   Defendant Salmi placed Finley at a moderate risk level with restrictions and ordered observation.   On two occasions, she reduced his risk level to an intermediate level when Finley had demonstrated self-control of his actions and denied thoughts of suicide or self-harm. (*Id.* at PageID.1162.)   The medical record shows that Defendant Salmi took appropriate precautionary actions to protect Finley from self-harm.   The fact that Finley was still able to harm himself does not establish that Defendant Salmi acted with deliberate indifference. In the opinion of the undersigned, Finley has failed to establish a genuine issue of material fact regarding his Eighth Amendment deliberate indifference claim against Defendant Salmi.

Defendant Mleko was involved in Finley's care on September 5, 2016, when Finley was spitting up blood.   As outlined above, Defendant Mleko contacted the medical provider and obtained authorization to transport Finley to the hospital.   In the opinion of the undersigned, Finley's disagreement with the manner that

---

[4]    Finley voluntarily dismisses Defendant Salmi from the allegations he made against her in Case No. 2:17-cv-159, which involved medical care.   It appears that Finley's claim against Defendant Salmi involves only her mental health assessments.

24

Defendant Mleko provided medical care, including his statements and mannerisms, fail to establish a genuine issue of material fact regarding his Eighth Amendment deliberate indifference claim against Defendant Mleko.

Similarly, Finley cannot establish that Defendants Hedlund, Foster, Steede, or Kimsel acted with deliberate indifference toward Finley's serious medical needs. These Defendants had limited involvement in Finley's medical care.  The evidence in the case fails to establish a genuine issue of material fact regarding Finley's Eighth Amendment deliberate indifference claims against Hedlund, Foster, Steede, and Kimsel.

For these same reasons, it is the opinion of the undersigned that Finley's conspiracy claims against Defendants Mleko, Foster, and Hedlund are unsupported by facts.  Conspiracy claims unsupported by material facts fail to support a claim under 42 U.S.C. § 1983.  *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987); *Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir. 1984).  In order to prove a civil conspiracy, a plaintiff must show that there was a single plan, that the coconspirators shared in the objective of the conspiracy, and that an overt act was committed in furtherance of the conspiracy. *Moore v. City of Paducah*, 890 F.2d 831, 834 (6th Cir. 1989).  For the reasons explained, Finley's conspiracy allegations fall far short of showing overt acts taken in furtherance of a conspiracy.

Defendant Samuelson's only involvement in Finley's care during September 2016 was to authorize Finley's transportation to the Marquette General Hospital emergency department on the 1st, 5th, and 29th of September. On each occasion,

after Defendant Samuelson was contacted by nursing staff at MBP, she authorized Finley's transportation to the hospital.   Contrary to Finley's assertion, Defendant Samuelson never refused a request to transfer Finley to the hospital in September of 2016.   In the opinion of the undersigned, the evidence in the case fails to establish a genuine issue of material fact regarding Finley's Eighth Amendment deliberate indifference claims against Defendant Samuelson.

Defendant Falk provided medical care for Finley on September 2, upon his return from Marquette General Hospital.   (Case No. 2:17-cv-159, ECF No. 58-3, PageID.597.)   Defendant Falk examined Finley and told him to contact health care services if he noticed bleeding from his mouth or rectum.   (*Id.*)   In addition, Defendant Falk ordered imaging studies to follow the razor blade through Finley's bodily systems. (*Id.*)

On September 6, 2016, Defendant Falk ordered Tylenol-3 with Codeine and instructed Finley to follow-up as needed.   (*Id.*)   After he swallowed a second razor blade on September 20, 2016, that passed into his intestines and could not be retrieved, Finley returned to MBP from the hospital with instructions to monitor for gastrointestinal bleeding.   (*Id.*)   Defendant Falk obtained approval for a medical consult with Dr. Papendick and ordered medications with instructions to follow-up as needed. (*Id.*)

After Finley swallowed a third razor blade on September 28, 2016, Defendant Falk spoke with a doctor from Marquette General Hospital.   The doctor was unable to remove the razor blade that had lodged at the back of Finley's throat, but he was

able to remove razor blade pieces from Finley's stomach. (*Id.* at PageID.598.) Defendant Falk instructed Finley to stop ingesting razor blades and informed him that a piece of razor blade was still in his pharynx. (*Id.*) Defendant Falk obtained approval to transfer Finley to a facility for specialized care and provided Finley with Tylenol-3 tablets. (*Id.*) Defendant Falk had no other involvement in Finley's care during the relevant time period. (*Id.*) In the opinion of the undersigned, Finley has failed to establish that Defendant Falk acted with deliberate indifference.

### 3. Failure to Protect

Finley asserts that Correctional Officers failed to protect him from engaging in self harm and caused unnecessary delays in obtaining medical treatment. Inmates have a constitutionally protected right to personal safety grounded in the Eighth Amendment. *Farmer*, 511 U.S. at 833. Thus, prison staff are obliged "to take reasonable measures to guarantee the safety of the inmates" in their care. *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). To establish a violation of this right, Finley must show that each Defendant was deliberately indifferent to a risk of injury. *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990). In doing so, Finley must establish that each Defendant: (1) perceived facts from which to infer a substantial risk of self-harm, (2) drew an inference that there was a substantial risk of self-harm, and (3) disregarded that risk. *Turner v. Ecorse*, 627 Fed. Appx. 400, 407 (6th Cir., June 28, 2018).

27

## Analysis

Finley alleges that Defendant Feltner ignored his requests for medical care on August 31 and September 1, 2016. Defendant Feltner attests that he does not recall Finley asking for medical attention or showing him self-inflicted arm wounds. (Case No. 2:17-cv-149, ECF No. 90-9, PageID.1307.)   Defendant Feltner states that he would have contacted a supervisor and medical staff.   (PageID.1308.)   The record establishes that Finley received medical attention on August 31, and September 1, 2016.   (ECF No. 90-1, PageID.1166-1178.)   The record indicates that Finley received medical care on the days he alleges Defendant Feltner ignored his requests for medical care.   Thus, the record directly contradicts Finley's claims against Defendant Feltner.   Finley has failed to show that a genuine issue of material fact exists with regard to whether Defendant Feltner was deliberately indifferent to a known risk of harm or caused any unnecessary delay in Finley's medical treatment.

Finley alleges that Defendants Schetter denied him medical care on September 26, 2016.   The record contradicts Finley's claims.   Defendant Schetter attests that Finley did not ask for medical care, did not state that he was in pain, and did not show Schetter his self-inflicted arm wounds.   (Case No. 2:17-cv-149, ECF No. 90-11, PageID.1315.) Furthermore, Schetter notes that he was working on the Brooks Center Infirmary on this date, and that Finley was housed in administrative segregation in E-unit at this time.   Finley has failed to provide evidence that addresses this contradiction.   In the opinion of the undersigned, Finley has failed to

allege facts establishing a genuine issue of material fact relating to Finley's claim that Defendant Schetter was deliberately indifferent to a known risk of harm or caused any unnecessary delay in Finley's medical treatment.

Finley alleges that, on August 31, 2016, he notified Defendant Sharrett that he wanted to see a nurse, but Defendant Sharrett closed the door and walked away. Defendant Sharrett attests that after he observed Finley picking at the wounds on his injured arms, he contacted health care.   (Case No. 2:17-cv-149, ECF No. 90-12, PageID.1320.)   The record establishes that Finley received medical attention on August 31, thus contradicting Finley's claim. (ECF No. 90-1, PageID.1167-1173.)

Finley also states that both Defendant Schetter and Defendant Sharrett ignored his requests on September 2, 2016 for medical treatment, but he admits that he was informed that a nurse was contacted. (2:17-cv-159, ECF No. 1, PageID.9.)   As outlined above (*see supra*, pages 17-18), on September 2, 2016, Finley spent time in the hospital, was released and received extensive care from MBP medical personnel. Given the wide range of care Finley received that day, the undersigned concludes that the record fails to establish a genuine issue of material fact relating to Finley's claims against Defendants Schetter and Sharrett for their conduct on that day.

Finley alleges that Defendant Kratt ignored his medical needs on September 8, 2016.   Kratt attests that he conducted a round on September 8, 2016, in Finley's unit.   (Case No. 2:17-cv-149, ECF No. 90-10, PageID.1311.)   Defendant Kratt says he did not observe Finley engage in self-harm and Finley did not request medical attention.   (*Id.*)   Officer Fish, the next officer to perform rounds, observed Finley

29

engaging in self-harm.   (*Id.* at PageID.1312.)   Officer Fish contacted medical staff. (*Id.*)   And, as noted above (see supra, pages 19-20), Finley received extensive medical attention on September 8, 2016.   Finley's allegations fail to show that Defendant Kratt was aware that Finley needed medical attention, nor do they show that Kratt acted with deliberate indifference to Finley's medical need or that he caused any unnecessary delay in Finley's medical care.

Finley alleges that Defendant Tasson violated his rights.   Defendant Tasson attests that he has no recollection of Finley.   (Case No. 2:17-cv-149, ECF No. 90-13, PageID.1323.)   However, Finley admits that on the occasion he showed Defendant Tasson cuts on his arm, Defendant Tasson contacted medical staff.   (Case No. 2:17-cv-159, ECF No. 1, PageID.6, 7, 11.)   Finley has failed to establish that Defendant Tasson acted with deliberate indifference to his medical needs.

Defendant Baldini admits that he gave Finley a razor blade to shave his face on September 18, 2016, while Finley was assigned to general population. (Case No. 2:17-cv-149, ECF No 90-7, PageID.1296-1299.) Defendant Baldini states that he was unaware that Finley had a history of self-injurious behavior and of swallowing razor blades.   (*Id.*)   Inmates assigned to general population typically are allowed temporary use of a razor blade.   (*Id.*)   Defendant Baldini ordered Finley to return the razor blade upon finishing his shave.   (*Id.* at PageID.1299.)   Finley refused. (*Id.*)   Finley was then taken to temporary segregation and strip searched, but the razor blade was not found.   (*Id.*)   Defendant Baldini was assigned to constantly monitor Finley.   Finley was able to cut his arm despite constant observation.   (*Id.*)

30

Finley told Defendant Baldini he did it with the razor blade.   (*Id*.)   Defendant Baldini ordered Finley to return the razor blade, but Finley stated that he had swallowed it.   Defendant Baldini contacted medical staff. (*Id*.)   In the opinion of the undersigned, there exists no evidence which can establish that Defendant Baldini acted with deliberate indifference.   There exists no evidence to establish that Defendant Baldini was aware of Finley's history of harming himself with razor blades. At best, Defendant can argue that Defendant Baldini acted negligently by giving Finley a razor blade.

### Qualified Immunity

As an alternative argument, Defendants move to dismiss Finley's damages claims by asserting qualified immunity from liability.   "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir.2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   Determining whether the government officials in this case are entitled to qualified immunity generally requires two inquiries: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id.* at 538-39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir.2006).

31

"A right is 'clearly established' for qualified immunity purposes if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001)). The inquiry whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156; *see also Plumhoff v. Rickard*, 572 U.S. 765, 779, 134 S. Ct. 2012, 2023 (2014) (directing courts "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced") (internal quotation marks and citations omitted). Thus, the doctrine of qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Humphrey*, 482 F.3d at 847 (internal quotation marks omitted).

"The relevant inquiry is whether existing precedent placed the conclusion" that the defendant violated the plaintiff's rights "in these circumstances 'beyond debate.'" *Mullenix v. Luna*, 36 S.Ct. 305, 309 (2015), citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In the undersigned's opinion Defendants are entitled to the defense of qualified immunity from liability.   Finley has failed to show that any of the Defendants acted with deliberate indifference towards his medical needs or failed to protect him from a known harm.

32

## Recommendation

A review of the record establishes that Finley has a serious mental health need. Defendants' responses to each razor blade cutting and swallowing incident may not have resulted in stopping further, similar conduct, and in some instances were arguably negligent.   But the facts do not support a conclusion that a genuine issue of material fact remains with regard to Finley's claims that any Defendant acted with deliberate indifference to either Finley's safety or his mental health and medical needs.

For these reasons, I respectfully recommend that the Court grant Defendants' motions for summary judgment.   (ECF Nos. 59 and 88 in case no. 2:17-cv-149 and ECF Nos. 58 and 92 in case no. 2:17-cv-159.) In addition, it is recommended that the Court deny Finley's motion to strike affidavits.   (ECF No. 101 in case no. 2:17-cv-149 and ECF No. 105 in case no. 2:17-cv-159.)

Acceptance of this recommendation will result in the dismissal of this action.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:    August 29, 2019                    /s/ *Maarten Vermaat*
                                             MAARTEN VERMAAT
                                             U.S. MAGISTRATE JUDGE